# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 08-1749

_____

Arboleda A. Ortiz,                                 *
                                                   *
          Movant - Appellant,                      *
                                                   *   Appeal from the United States
     v.                                            *   District Court for the Western
                                                   *   District of Missouri.
United States of America,                          *
                                                   *
          Respondent - Appellee.                   *
                                                   *
                                                   *
_____                             *
                                                   *
Republic of Colombia; American                     *
Association on Intellectual and                    *
Developmental Disabilities and                     *
the ARC of the United States;                      *
Concerned Experts in Mental                        *
Retardation/Intellectual Disability,               *
                                                   *
          Amici on behalf of Appellant.            *

_____

Submitted: April 11, 2011
Filed:  December 19, 2011

_____

Before RILEY, Chief Judge, BENTON and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Arboleda A. Ortiz, a federal prisoner awaiting execution on two death sentences, appeals the district court's denial of his petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. On appeal, we review Ortiz's claims that (1) he is mentally retarded and therefore ineligible for execution under Atkins v. Virginia, 536 U.S. 304 (2002) (Atkins claim), and (2) the ineffective assistance of his counsel during the penalty phase of his trial violated the Sixth Amendment (ineffective assistance claim). After careful review of the record, we affirm the district court's denial of Ortiz's ineffective assistance claim, but vacate the district court's denial of the Atkins claim and remand for further consideration in light of certain new evidence.

## I.    BACKGROUND
### A.    Underlying Crime

Ortiz, a 44-year-old Colombian national, immigrated illegally to Houston, Texas, in 1991. Ortiz was associated with the Colombian drug cartel "la oficina." Along with co-defendants Plutarco Tello, German Sinisterra, and Edwin Hinestroza, Ortiz was convicted for participating in the 1998 drug-related murder of Julian Colon.

The immediate chain of events leading to the murder began on November 19, 1998, in Kansas City, Missouri, when Monica Osma, Hinestroza's live-in girlfriend, reported that some men broke into their apartment, beat her up, and stole more than $240,000 of Hinestroza's drug money. After the robbery, Hinestroza sent Osma to Houston, Texas, for medical treatment and so his drug partner, Jamie Hurtado, could interview her. While Osma was in Houston, Ortiz and Tello visited her. Claiming to represent "la oficina," the men questioned Osma about the robbery and asked her to show photographs and medical records demonstrating her injuries. Apparently not satisfied with Osma's account, either Ortiz or Tello said "murraco," which was understood as a potential death threat.

Ortiz, Tello, and Sinisterra soon traveled from Houston to Kansas City, in order to help Hinestroza collect the money. On November 28, 1998, the group met

Hinestroza and two of his associates, Colon and Andres Borja-Molina, at a motel. Colon and Borja-Molina came to the meeting believing they were going to help in trying to recover the money from a drug client of Hinestroza, but in fact, they were the intended targets.

The group took Colon and Borja-Molina to a house, separated the two men, tied them up with duct tape, beat them, and demanded they return the stolen money. Eventually, Borja-Molina heard Hinestroza order both men shot. Sinisterra shot Colon in the head, killing him. Someone shot at Borja-Molina, but missed.[1] Borja-Molina pretended to be dead as he was carried out of the house, placed into the trunk of a car with Colon's body, driven to a park, and abandoned. Borja-Molina eventually escaped from the trunk and reported the murder to the authorities.

The police soon arrested Ortiz, Tello, and Sinisterra. Hinestroza was not apprehended by authorities until February 2004.[2] Ortiz admitted to police that he came to Kansas City "to do a job," for which he was to be paid $1,000, and he was present during the murder.

## B.     Conviction and Sentencing

A federal grand jury indicted Ortiz, Tello, Sinisterra, and Hinestroza for, as relevant, conspiring to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count One), using a firearm during a drug-trafficking crime and murdering Colon in violation of 18 U.S.C. §§ 924(c)(1), (j)(1)

---

[1]It is not entirely clear from the trial record who fired the shot at Borja-Molina. Ortiz's lead trial counsel at the post-conviction evidentiary hearing testified Ortiz shot at Borja-Molina.

[2]Hinestroza was tried separately from Ortiz, Tello, and Sinisterra. In November 2005, a jury found Hinestroza guilty on all counts and he was sentenced to life imprisonment.

and 2 (Count 2), and knowingly traveling in interstate commerce with the intent to murder in exchange for money in violation of 18 U.S.C. §§ 1958 and 2 (Count 3). The government gave notice of its intent to seek the death penalty.

In April 2000, the case against Ortiz, Tello, and Sinisterra proceeded to trial. The jury found the defendants guilty on all counts. During the penalty phase of the trial, the jury first determined sentences of death should be imposed on Sinisterra and then the penalty phase of Ortiz's trial began.

Ortiz had deposed and planned on calling three mitigating witnesses, former girlfriends Shaunte Cooper and Louvina "Nikki" Reed, and friend Carolyne Riley. Considering the jury's response to Sinisterra's evidence and the substantial adverse change in the three witnesses' stories about Ortiz, attorney Larry Pace informed the district court and the government before the penalty phase began Ortiz would not call these witnesses. Pace also waived his opening statement and informed the district court Ortiz had decided not to testify. The district court questioned Ortiz on the record, and Ortiz said he understood his rights, but wished not to testify.

After the government presented its case for imposing the death penalty, Pace focused on the events of November 28, 1998, and argued Ortiz deserved different treatment from Sinisterra primarily because, unlike Sinisterra, there was no evidence Ortiz was anything but "the lowest level mule" in the operation and Ortiz did not kill anyone. Pace also stressed other mitigating factors such as (1) Ortiz's lack of criminal history; (2) Ortiz did not participate in the binding, beating, or shooting of Colon; (3) the likelihood Ortiz would serve his time in prison peacefully; and (4) the fact Colon, the murder victim, risked his own life by his actions leading up to the murder.

The jury unanimously decided Ortiz should be sentenced to death on both counts.[3] In December of 2000, the district court conducted Ortiz's sentencing hearing. The district court ordered Ortiz sentenced to 235 months imprisonment for Count One and death on Counts Two and Three.

## C.     Direct Appeal

Ortiz and Sinisterra appealed, raising multiple challenges not directly relevant to this appeal. See United States v. Ortiz, 315 F.3d 873, 878 (8th Cir. 2002). We affirmed the convictions and sentences, see id. at 904, and the Supreme Court denied Ortiz's petition for certiorari, see Ortiz v. United States, 540 U.S. 1073 (2003).

## D.     Motion for Post-Conviction Relief

In December 2004, Ortiz moved to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255. In his § 2255 motion, Ortiz raised, among other claims, his Atkins and ineffective assistance challenges. In November 2007, the district court held a three-day evidentiary hearing on the motion. Ortiz presented three broad categories of evidence at the hearing: (1) general mitigation evidence based upon Ortiz's background, (2) evidence Ortiz is mentally retarded, and (3) evidence related to the ineffective assistance of counsel claim.

### 1.     Ortiz's Background

Dhyana Fernandez, a mitigation specialist, testified she traveled to Ortiz's hometown of Buenaventura, Colombia, and to Houston, Texas, in order to conduct an investigation of Ortiz's social history. Fernandez interviewed Ortiz's friends and family, including his father and his paternal grandmother.

Fernandez reported Ortiz's mother abandoned him when he was two months old. Ortiz was raised by his paternal grandmother. Ortiz's family noticed he was

---

[3]The district court sentenced Tello to life imprisonment.

developmentally delayed in the areas of communication, reading, numbers, and memory skills. Ortiz had little education, dropping out of school when he was seven or eight years old because he had difficulty learning and other children teased him. Instead of going to school, Ortiz worked with his grandmother growing fruit on a small plot of land. Ortiz's family reported he suffered from various undocumented illnesses and injuries as a child, including fevers, bacterial meningitis, and two possible instances of untreated head trauma.

Fernandez reported Ortiz tried working for his father's construction company, but was unsuccessful because he was unable to learn the various construction tasks. Ortiz and his father had an argument, resulting in the father shooting at Ortiz. Ortiz also served in the Colombian military, where he went AWOL on several occasions after becoming homesick. When Ortiz illegally immigrated to Houston in 1991, he worked sporadically throughout 1992 and into 1994 as a day laborer and later occasionally as an assistant to a mechanic. According to Fernandez, Ortiz always lived with and was dependent upon other people.

Two lay witnesses testified Ortiz also sold drugs and "worked" as a hit man. Borja-Molina testified that before the murder, he had completed a drug transaction with Ortiz, who was acting on behalf of Fabio Montano. According to Borja-Molina, Ortiz offered his services as a hit man to Borja-Molina. Marvin Collins also testified he was involved in drug transactions with Ortiz, who he met through Montano.

### 2. Evidence Related to Mental Retardation

In evaluating Ortiz's <u>Atkins</u> claim, the district court utilized the definitions of mental retardation as provided by the American Psychiatric Association's (APA) Diagnostic and Statistical Manual of Mental Disorders (4th ed., text revision 2000)

(DSM-IV-TR) and the American Association on Intellectual and Developmental Disabilities (AAIDD). [4]

> The AAIDD and APA, whose prior definitions of mental retardation were footnoted in <u>Atkins</u>, define mental retardation in similar ways. The AAIDD defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."
>
> . . . .
>
> For a diagnosis of mental retardation under the DSM-IV-TR, the APA notes the following features: (1) significantly subaverage intellectual functioning (an IQ of approximately 70 or below); (2) concurrent deficits or impairments in present adaptive functioning (i.e., how effectively the individual copes with common life demands and how they meet the standards of personal independence expected of someone in their age group, sociocultural background, and community setting) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (3) onset before age 18 years.

<u>Ortiz v. United States</u>, No. 04-8001, slip op. at 3-4 (W.D. Mo. Dec. 14, 2007) (internal citations omitted). Under either definition, a mental retardation diagnosis requires significantly limited intellectual functioning (intellectual function prong) and adaptive functioning (adaptive function prong) originating before the age of 18 (age prong).

---

[4]The AAIDD, formerly known as the American Association for Mental Retardation (AAMR), explains "[t]he term 'mental retardation has become the subject of considerable discussion recently among professionals in the field. Increasingly, those professionals employ the term 'intellectual disability' in place of 'mental retardation.'" For purposes of consistency, we use the term "mental retardation."

### a.    Expert Testimony

The district court heard testimony from two psychologists, Ricardo Weinstein, Ph.D., who was hired by Ortiz, and Carmen Vasquez, Ph.D., who was hired by the government.  Dr. Weinstein and Dr. Vasquez both conducted comprehensive mental examinations of Ortiz, consisting of clinical interviews and an assortment of tests to assess Ortiz's cognitive ability.  Based upon the results, Dr. Weinstein opined Ortiz was mentally retarded, explaining Ortiz "has an I.Q. below 70, he exhibited significant deficiencies in many areas relating to his adaptive behaviors and these conditions were present before the age of 18."  Conversely, Dr. Vasquez determined Ortiz was not mentally retarded, stating instead, "Ortiz seems more like someone who lived such a deprived life that he simply was not given the opportunity to learn."  Dr. Vasquez attributed Ortiz's intellectual challenges, such as his illiteracy, to his lack of schooling, poor economic background, lack of opportunities, and likely emotional depression.

During their examinations of Ortiz, both Dr. Weinstein and Dr. Vasquez administered two tests to assess Ortiz's level of intellectual function.  Dr. Weinstein administered the Spanish version of the Wechsler Adult Intelligence Scales III (WAIS-III), upon which Ortiz obtained an I.Q. score of 54, and the Bateria Woodcock-Munoz-Revisada (Bateria W-M-R), on which Ortiz obtained an estimated I.Q. score of between 44 and 50.  Dr. Vasquez administered the Spanish version of the Woodcock-Johnson III Tests of Cognitive Abilities (Bateria III), upon which Ortiz obtained an I.Q. score of 70, and the Comprehensive Test of Non-Verbal Intelligence (C-TONI), upon which Ortiz obtained I.Q. scores of 47 on the Nonverbal section and 51 on the Pictorial and Geometric Nonverbal sections.

Dr. Weinstein opined the test scores indicated Ortiz was deficient on the intellectual function prong since all of his I.Q. scores "fall within the range of mental retardation."  Dr. Weinstein explained the tests had "convergent validity," meaning their consistency decreased the likelihood Ortiz purposely achieved such low scores.  Dr. Vasquez disagreed, believing Ortiz attempted to malinger on the exams she

administered—meaning he intentionally produced false or greatly exaggerated symptoms, or Ortiz was uncooperative while taking the tests. In her report, Dr. Vasquez acknowledged, "Ortiz's results indicate borderline mental functioning," but stressed his "variable performance, almost complete lack of schooling, depressed and anxious mood, and poor cooperation confound the validity and accuracy of his level of cognitive functioning." Dr. Vasquez also opined Dr. Weinstein's use of United States norms on the Spanish verison of the WAIS-III was inappropriate, casting doubt on the validity of Ortiz's WAIS-III score because Ortiz was not compared to other similarly-situated individuals.

Dr. Weinstein and Dr. Vasquez also disagreed as to whether Ortiz met the adaptive function prong. Dr. Weinstein, relying in part on Fernandez's social history report, surmised Ortiz had significant deficiencies in three adaptive skill sets (conceptual, social, and practical), noting Ortiz's inability to achieve success in school, poor interpersonal skills, inability to accomplish simple tasks as a child, dependence upon others to take care of his personal hygiene and health, inability to learn simple unskilled labor tasks, inability to manage his own finances, and general dependence upon others to function in society. According to Dr. Weinstein, the skills Ortiz now possesses were developed in a delayed fashion.

Dr. Vasquez collected data regarding Ortiz's adaptive functioning by administering the Adaptive Behavior Assessment System, Second Edition (ABAS-II), which measures ten different adaptive function areas. From this information, her own personal observations of Ortiz, and a review of Ortiz's records including his recorded confession to police, Dr. Vasquez believed Ortiz did not meet the adaptive deficit prong. Interpreting Ortiz's results on the ABAS-II, Dr. Vasquez discounted Ortiz's "extremely low" scores in the skill areas of functional academics, leisure, and self-direction, as well as the conceptual and social composite categories, claiming her purpose in administering the test was merely to collect information about how Ortiz functioned in the world. She also noted "[t]he areas that [Ortiz] did not score well in

were heavily related to his incarceration and limited freedom, illiteracy, level of acculturation and little to no formal education." In making her diagnosis, Dr. Vasquez emphasized areas she found Ortiz demonstrated ability to function, such as his ability to (1) learn and speak some English; (2) care for personal hygiene; (3) travel through airports; (4) drive a car and ride a bike; (5) perform domestic tasks including house cleaning, washing clothes, and cooking some sophisticated fish and seafood dishes; (6) father and care for his, and his girlfriend's, children; (7) demonstrate proper manners; (8) watch Spanish news and soap operas on television and recall some of the stories; and (9) evidence good social/interpersonal skills. Dr. Vasquez believed these abilities showed Ortiz "was functioning appropriately to [Colombian immigrants] and in comparison to [Colombian immigrants]."

The district court also received a declaration from another psychologist, John Olley, Ph.D., in support of Ortiz.[5] Dr. Olley reviewed and offered his opinion as to Dr. Weinstein's and Dr. Vasquez's reports, as well as Ortiz's mental status. Dr. Olley declared, "that based upon the test data set forth in Dr. Vasquez's report [Ortiz] is a person with mental retardation" and "Dr. Vasquez's conclusion to the contrary is simply not supported by her data."

Dr. Olley criticized Dr. Vasquez's assertion that malingering contributed to Ortiz's low I.Q. scores, noting the consistency of the scores demonstrated they were reliable and possessed convergent validity. Dr. Olley found it "inconceivable that a person could malinger in such a consistent fashion over three tests separated in time by many months." Dr. Olley also disagreed with Dr. Vasquez's criticism of Dr. Weinstein's methods, especially her assertion that the validity of Ortiz's WAIS-III score depended on being compared, or normed, to other Colombians without a formal education. Dr. Olley claimed this position "is contrary to fundamental notions of

_____

[5]The district court denied Ortiz's motion to pay for Dr. Olley to testify at the § 2255 hearing.

psychometric intelligence testing" because "[i]ntelligence tests are normed on an entire population, not the presumably lowest scoring segments." Dr. Olley maintained there are no Colombian norms for the test, and although the use of United States norms was not a perfect fit, there was no reason to believe using Mexican norms, for example, would be more appropriate. Dr. Olley also thought the WAIS-III was "constructed to minimize or eliminate test items that are tied to a specific country."

Dr. Olley also criticized Dr. Vasquez's methods in assessing Ortiz's adaptive function. Dr. Olley emphasized the scores obtained by Ortiz on the ABAS-II showed Ortiz "is two standard deviations below the norm in several areas" and it was unjustified for Dr. Vasquez to discount those scores as significantly related to his incarceration, or to minimize the importance of the scores by focusing on Ortiz's "relative strengths." Dr. Olley also believed Dr. Vasquez's efforts to explain Ortiz's low scores as being caused by limited educational opportunities and a lack of socialization were "contrary to accepted nosology[6] in [the mental retardation] field." Instead of justifications for Ortiz's deficits, Dr. Olley maintained Ortiz's lack of education and socialization were "risk factors" for mental retardation.

### b.    Other Testimony

Lay witness testimony also produced evidence relevant to Ortiz's mental status. Borja-Molina and Collins testified about their interactions with Ortiz. Collins talked with Ortiz in English and said Ortiz could understand him. Collins successfully bought cocaine from Ortiz on two or three occasions at $22,000 per kilogram. Collins also testified he saw Ortiz driving a black Lexus. Borja-Molina communicated with Ortiz in Spanish and reported Ortiz had no difficulties understanding the conversations, and Ortiz responded appropriately and rationally. Federal Bureau of

---

[6]Nosology is "a branch of medical science that deals with orderly relating or classification of diseases." *Webster's Third New International Dictionary* 1542 (1993).

Investigation (FBI) Special Agent Michael Oyler testified about an interaction he had with Ortiz in December 1998 while transporting Ortiz from a detention center to the courthouse. As they drove, Ortiz initiated a conversation and again admitted he was present during the murder, but emphasized Sinisterra was the killer. During this conversation, Ortiz and the agents spoke in English and Special Agent Oyler perceived Ortiz had no difficulty communicating or understanding.[7]

Mitigation specialist Fernandez also testified she was able to communicate very well with Ortiz in Spanish. But Fernandez explained that in her dealings with Ortiz, she became suspicious he might have cognitive issues because Ortiz "had a difficult time reporting very fundamental and basic things about his past," which Fernandez suspected was because of "very poor memory recall."

### c. Driver's License

A dispute arose during the hearing as to whether Ortiz possessed a driver's license. During cross-examination, the government asked Fernandez if Ortiz had obtained a driver's license. Fernandez said she did not know but continued, "I doubt very, very much he had ever had a driver's license because he couldn't pass an exam. We have all agreed he's illiterate." Later, Special Agent Oyler testified, without objection by Ortiz, that during his investigation of Ortiz's subpoenaed phone records, he discovered Ortiz had a Texas driver's license. Special Agent Oyler testified the FBI had verified Ortiz's Texas driver's license by computer check and it expired in April 2001. The government conceded at oral argument this information was not correct.

---

[7]We do not suggest that Ortiz's ability to communicate is inconsistent with a mental retardation diagnosis. Ortiz's ability to communicate in English, however, demonstrates an intellectual ability to learn a second language.

### 3. Ineffective Assistance of Counsel

Three members of Ortiz's trial defense team testified at the § 2255 hearing: Assistant Federal Public Defender Pace, who was Ortiz's lead counsel and responsible for the penalty phase; an experienced death penalty defender, Jose Lozano Jr., who was primarily responsible for the guilt phase; and Ronald Ninemire, employed by the federal public defender's office, who served as Ortiz's chief investigator. Lozano had the most direct contact with Ortiz. This was in part because Ortiz stopped meaningful communication with Pace and Ninemire. Pace "wanted [Ortiz] to do some mental work and [Ortiz] didn't want to do that so . . . he just stopped talking with [Pace]." Lozano talked with Ortiz in Spanish. Pace and Ninemire mostly talked with Ortiz in English, but had a Spanish interpreter with them during meetings.

All three defense team witnesses testified they had difficulty getting information from Ortiz about his Colombian family. Ortiz initially told counsel his parents were dead. In January 1999, Ortiz provided a list of family members to Lozano, but repeatedly instructed Lozano not to bother or contact the family. Lozano forwarded a memorandum containing this information to Pace.

Pace testified that he and Ninemire traveled to Houston more than once and met with "lots and lots of different people" while investigating Ortiz's history. This included meetings with Ortiz's former live-in girlfriends Cooper and Reed, as well as Riley, a woman Ortiz "kind of considered his mom in the [United States]." Pace and Lozano also traveled to Las Vegas, Nevada, and "spent three days wining and dining Fabio Montano for information" about Ortiz because "Fabio knew the family in Columbia and had gone back to Colombia." The defense team, through their investigation, learned Ortiz had an uncle, Jose Reyes, who was imprisoned in a Huntsville, Texas, prison. Lozano and Ninemire traveled to the prison and asked Reyes for information regarding Ortiz's Colombian family. Reyes later sent a list of names, addresses, and telephone numbers of Ortiz's family members to counsel. Pace and Lozano testified they acted on this information by calling the telephone numbers

and mailing letters to the addresses. Although some people answered calls, they were non-responsive, and counsel was unsuccessful in their attempts at contacting anyone from Ortiz's Colombian family.

Pace testified the defense team prepared for an investigation in Colombia. Pace and Ninemire traveled to Chicago to meet with the Colombian consulate and asked for assistance in contacting Ortiz's family, but "[n]ever heard back from them again." In preparation for a trip to Colombia—at the time an "extremely dangerous" place—Pace applied for a passport and received authority from the federal public defender's office to travel to Colombia. Ortiz's defense team also contacted a Colombian mitigation specialist, Hector Guevara, who was retained to perform a mitigation investigation in Colombia. The federal public defender approved $35,000 in funding for the investigation. However, Pace testified that because they were unable to establish any contact with Ortiz's Colombian family, the planned trip to Colombia never took place.

Pace and Lozano subpoenaed Cooper, Reed, and Riley to testify on Ortiz's behalf during the penalty phase. Pace testified all three witnesses resisted the subpoena, with Riley hiring a Houston lawyer to oppose the subpoena. After traveling to Kansas City, each of the witnesses changed her story about Ortiz the day before they were to testify. According to Pace, the women said they would testify Ortiz was a drug dealer and murderer who was violent toward them and others. Pace explained to Ortiz what the three women were going to say, and recommended not calling them as witnesses. Ortiz agreed, and Pace released the witnesses immediately so the government would not have an opportunity to talk with the three women.

Pace explained that once Cooper, Reed, and Riley changed their stories, he focused on distinguishing Ortiz from Sinisterra, because "the only way [counsel] had at this stage was [Ortiz] didn't kill anybody." Pace testified he felt he needed to explain to the jury why he did not put on any witnesses without telling them the real reason, which would have been damaging to Ortiz's defense. The jury had just given

-14-

Sinisterra the death penalty after Sinisterra presented "a significant parade of family members" crying for leniency and giving "heart-wrenching" testimony. So Pace "tried to explain to [the jury the absence of Ortiz's family] by saying [he didn't] want to insult [the jury's] intelligence by bringing" mitigating witnesses like Sinisterra had previously done.

## E.     District Court's Denial of Ortiz's § 2255 Motion

On December 14, 2007, the district court denied Ortiz's § 2255 motion, finding, among other things, Ortiz "failed to prove he is mentally retarded" and his trial attorneys' assistance was not constitutionally defective.

### 1.     Denial of Atkins Claim

The district court found Dr. Weinstein's testimony insufficiently reliable to meet the standard for expert testimony, see Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-95 (1993), and was not as reliable as Dr. Vasquez's testimony. The district court found three primary flaws in Dr. Weinstein's testimony.

First, the district court found Dr. Weinstein's scoring of Ortiz's WAIS-III results was unreliable because the court was "not satisfied substituting [United States norms] is sufficient to make the WAIS-III a reliable instrument for assessing Ortiz's intellectual capabilities given his lack of acculturation and his illiteracy." The district court also found Dr. Weinstein might be biased in favor of a diagnosis of mental retardation. The district court found Dr. Weinstein testified he

> would change norms for a test based on the purpose of his evaluation. That is, U.S. norms would apply to legal proceedings such as this, but if Weinstein were to evaluate mental retardation for purposes of predicting Ortiz's performance in a Colombian university, U.S. norms would not be appropriate. Weinstein appears more concerned with legal culpability than with an objective assessment of intellectual capability.

The district court also found unreliable Dr. Weinstein's assessment of Ortiz's adaptive function because Dr. Weinstein minimized or ignored cultural differences, failed to consider significant evidence showing Ortiz's ability to function, and "drew broad conclusions in favor of mental retardation based on speculation and anecdoctal reports from family members without documentary support."

In contrast, the district court found Dr. Vasquez's testimony more reliable because she "properly accounted for cultural differences[,] Ortiz's background and illiteracy, and his demonstrated ability to function." The district court noted Dr. Vasquez properly considered the information collected through her administration of the ABAS-II in conjunction with evidence of record, including (1) Ortiz's ability "to drive and pass[] the test to acquire a Texas driver's license"; (2) travel and particularly "navigate a complex airport environment" alone; (3) learn English without formal instruction; (4) care for himself hygienically; (5) interact with others including "extensive relationships with women who do not speak Spanish"; (6) father and care for children; (7) cook and perform other domestic tasks; and (8) "surreptitiously travel to the United States from Colombia on more than one occasion . . . evad[ing] detection and mov[ing] around to carry out extensive criminal conduct despite his illiteracy." The district court agreed with Dr. Vasquez's conclusion that "Ortiz was responding appropriately for his age and level of education and was functioning appropriately in comparison to the group he represents." Finally, the district court found Dr. Vasquez's conclusion that Ortiz was not mentally retarded supported the district court's own "observations of Ortiz's mental capabilities and demeanor at trial."

## 2. Ineffective Assistance Claim

In Wiggins v. Smith, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)), the Supreme Court recognized "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all*

*reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" The district court found

> Counsels' actions and duties were in accordance with the standard set forth in [Wiggins], in that they knew and attempted to exercise their duty to investigate Ortiz's medical, family, social and educational history. Counsel followed up with Ortiz's family, friends and medical history to the extent possible.

The district court made numerous factual findings in reaching this conclusion. As relevant here, the district court found (1) counsel "spent weeks investigating Ortiz's background, personal history, medical history, and his relationship with others," despite Ortiz's lack of cooperation; (2) counsel made attempts to contact Ortiz's family in Colombia, but were unsuccessful as "the telephone numbers given proved to be invalid and the letters sent to contact family members went unanswered"; (3) "[t]ravel to Colombia would have been futile given [] Ortiz's refusal to cooperate in identifying his family and counsels' lack of any response from those identified through counsel's investigation as potential family in Colombia"; (4) the investigation yielded results in generating three witnesses who were subpoenaed to testify for Ortiz, but that testimony would have been detrimental to Ortiz's defense as they "advised counsel they would testify about additional criminal acts and violence committed by Ortiz"; (5) the prison visitation log indicated Pace visited Ortiz twice between January 1999 and April 2000, but other "members of the defense team made 26 visits to Ortiz during that same time frame"; (6) during his post-conviction relief, "Ortiz is now portraying himself in a light directly in contrast to the state of mind and mental capabilities he portrayed to his trial counsel and the [district court] . . . pre-trial, during trial and post-trial"; and (7) "Ortiz's own behavior and demeanor impeded his counsel from successfully pursuing a request for a mental examination or being able to contact [] Ortiz's family in Colombia."

Considering this evidence, the district court determined counsel's performance was not deficient. The district court did not reach the prejudice prong of Ortiz's ineffective assistance claim. See Strickland v. Washington, 466 U.S. 668, 687 (1984) (providing a "convicted defendant's claim that counsel's assistance was so defective as to require reversal of a . . . death sentence has two components:" deficient performance and prejudice).

### F. Appeal

The district court denied Ortiz's motion to alter judgment pursuant to Fed. R. Civ. P. 59(e), and granted a certificate of appealability (COA) on Ortiz's Atkins claim. Ortiz moved this court for an order broadening the COA, and we expanded the COA to include Ortiz's ineffective assistance claim in the penalty phase.

## II. DISCUSSION

### A. Standard of Review

We review a district court's denial of a § 2255 motion de novo. See United States v. Hernandez, 436 F.3d 851, 854 (8th Cir. 2006). Our de novo review applies to the district court's legal conclusions, and mixed questions of law and fact, see United States v. Duke, 50 F.3d 571, 576 (8th Cir. 1995), but we review underlying factual findings for clear error, see Hernandez, 436 F.3d at 855. The ultimate determination as to whether Ortiz is mentally retarded for Atkins purposes is a factual determination. See Walker v. Kelly, 593 F.3d 319, 323 (4th Cir. 2010); Maldonado v. Thaler, 625 F.3d 229, 236 (5th Cir. 2010). Ortiz's ineffective assistance claim "presents a mixed question of fact and law." United States v. White, 341 F.3d 673, 677 (8th Cir. 2003).

### B. Extra-Record Evidence

Before we reach the merits of Ortiz's challenges, we must first decide whether to consider extra-record evidence. The contested evidence consists of (1) two documents showing Ortiz was not issued a Texas driver's license, but did have a Texas

identification card; (2) declarations and opinions of purported experts in the field of I.Q. testing who challenge Dr. Vasquez's, and by implication, the district court's methodology in assessing Ortiz's mental status; (3) declarations from members of Ortiz's Colombian family claiming trial counsel did not attempt to contact them and summaries of mitigating testimony they could have supplied; (4) a declaration from an interpreter for trial counsel regarding Ortiz's cooperation; and (5) declarations from individuals claiming Pace's stated reason for not presenting testimony from planned mitigating witnesses Cooper, Reed, and Riley, was false. Ortiz moves to enlarge the record to include this evidence, while the government moves to strike all of the evidence except for the exhibits relating to the driver's license.

"Generally, an appellate court cannot consider evidence that was not contained in the record below." Dakota Indust., Inc. v. Dakota Sportswear, Inc., 988 F.2d 61, 63 (8th Cir. 1993); see Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 n.2 (8th Cir. 1998) (citing Fed. R. App. P. 10(a) and asserting "[t]he record on appeal . . . consists only of evidence presented to the district court"). "However, this rule is not etched in stone. When the interests of justice demand it, an appellate court may order the record of a case enlarged." Dakota Indust., 988 F.2d at 63 (enlarging the record where a "misrepresentation, willful or otherwise, left the district court with an incomplete picture" of the issue at hand); see Miller v. Benson, 51 F.3d 166, 168 (8th Cir. 1995) (enlarging the record to include evidence that was not previously available to the party and would have been helpful to the district court). But this is a narrow exception we exercise only in extraordinary circumstances. See Webb v. St. Louis Post-Dispatch, 51 F.3d 147, 149 (8th Cir. 1995).

This is such a case. Justice demands we enlarge the record to include the two exhibits demonstrating Ortiz did not have a driver's license, but instead a state-issued identification card. This misstatement by a government witness left the district court with an inaccurate view of Ortiz, as reflected in the district court's finding that Ortiz passed a Texas driver's license exam.

We decline, however, to enlarge the record to include the other challenged evidence. Nearly three years lapsed between Ortiz's filing of his § 2255 motion and the evidentiary hearing on that motion. These many months were marked by numerous delays initiated by Ortiz and his counsel. Ortiz had "ample time . . . to develop a record since filing his § 2255 motion . . . and the sheer volume of the material that [Ortiz] now seeks to present suggest that any gaps in the record are due to a lack of diligence on [Ortiz's] part." Von Kahl v. United States, 242 F.3d 783, 788 (8th Cir. 2001).

We grant Ortiz's motion to enlarge the record to include the driver's license documents but, for purposes of this appeal, we deny the balance of his motion to enlarge and grant the government's motion to strike the remaining proffered evidence, as well as the portions of the briefs referencing this evidence. On remand, the district court may consider this other untimely evidence at its considerable discretion.

### C. **Atkins** Claim

Executing mentally retarded capital offenders violates the Eighth Amendment's prohibition against cruel and unusual punishment. See Atkins, 536 U.S. at 321; see also 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."). The district court found Ortiz failed to prove he is mentally retarded and therefore denied his motion to vacate his sentences of death.

Ortiz asks us to grant him relief from his death sentences, claiming "[a] remarkable array of evidence, much of it undisputable, establishes that Ortiz has mental retardation." At a minimum, Ortiz argues we should remand for proper fact-finding and a "full and fair resolution" because the district court violated Ortiz's rights by sua sponte deeming Dr. Weinstein's testimony unreliable without notice or an opportunity to contest the Daubert ruling, made erroneous factual findings, and failed to make meaningful findings on several key issues. Ortiz also argues the district court employed reasoning that violates the Constitution.

-20-

For the reasons discussed below, we remand to the district court for further factual findings in light of new evidence establishing the district court clearly erred in finding Ortiz passed a Texas driver's license exam.

### 1. District Court's Reliance on Driver's License

Key to the district court's denial of Ortiz's Atkins claim was finding Dr. Vasquez more credible than Dr. Weinstein. In making this determination, the district court relied in part upon its factual finding that "Ortiz . . . passed the test to acquire a Texas driver's license." This finding was based upon FBI Agent Oyler's sworn testimony that Ortiz possessed a valid Texas driver's licence at the time of the murder. We now know Ortiz actually possessed a Texas state identification card, not a driver's license.

Our present task is to determine what potential impact this error had on the district court's ultimate finding that Ortiz failed to prove he is mentally retarded. The government maintains this error was harmless because there is other evidence showing Ortiz drove a vehicle, and the driver's license was but one of many facts upon which the district court relied in denying Ortiz's claim. Recognizing "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case," Kyles v. Whitley, 514 U.S. 419, 422 (1995) (quoting Burger v. Kemp, 483 U.S. 776, 785 (1987) (internal quotation marks omitted)), we cannot say the error was harmless.

The *potential* impact of the district court's belief that Ortiz passed a Texas driver's license exam is substantial. As Ortiz explains, this inaccuracy

> was extremely helpful to the [g]overnment and harmful to Ortiz. If true, the assertion supported the opinion of . . . Dr. Vasquez, that Ortiz functions at a higher cognitive level than would be expected from his mentally retarded-range IQ scores, and undermined the testimony of . . . Dr. Weinstein, that Ortiz has deficits in adaptive functioning

consistent with mental retardation, because . . . he purportedly passed a written test needed to get the license. It also appeared to undermine the testimony of Ortiz's mitigation specialist, Dhyana Fernandez, by calling into question her belief that Ortiz "couldn't pass an exam" for a driver's license because he is mentally retarded, and by generally undermining the apparent reliability and thoroughness of her investigation. . . . It made Ortiz himself look manipulative and dishonest, claiming to be illiterate when he is not. It made it appear that Ortiz was dishonest with the defense team, since Fernandez was taken aback when told that Ortiz had a valid driver's license.

We agree and add that the erroneous evidence also may have reinforced the perception Ortiz was intentionally performing poorly, or malingering, on the psychological tests in an effort to guarantee a diagnosis of mental retardation. See Atkins, 536 U.S. at 353 (Scalia, J., dissenting) (recognizing "the capital defendant who feigns mental retardation risks nothing at all").

Because the district court did not expressly resolve several important factual issues, we are particularly cautious in determining the potential impact of the driver's license finding. As Ortiz explains, the district court did not make "express finding[s], one way or the other, on whether Ortiz actually has significantly subaverage intellectual functioning, as the standards for mental retardation require" nor "whether Ortiz has any adaptive deficits under the AAMR or APA definitions." Without these specific findings we are unable to determine what aspects of the diagnostic criteria the district court found lacking, which prevents us from characterizing this error as harmless.

And though not facially improper at all, the district court's reliance upon its own independent observations of Ortiz in crediting Dr. Vasquez over Dr. Weinstein increases the possibility the district court's mistaken belief about the driver's license exam colored its credibility determinations, as well as its ultimate mental retardation finding. Because we cannot be fairly certain the error was harmless, we find it

-22-

appropriate to remand Ortiz's <u>Atkins</u> claim to the district court for further consideration, knowing now Ortiz did not pass a Texas driver's license exam.

## 2. **Daubert Ruling**

We next address Ortiz's challenge to the district court's <u>Daubert</u> ruling. Relying upon <u>Miller v. Baker Implement Co.</u>, 439 F.3d 407, 412 (8th Cir. 2006), Ortiz argues the district court violated our precedent by sua sponte determining Dr. Weinstein's testimony was unreliable under <u>Daubert</u> "without giving Ortiz any notice or opportunity to contest it." Ortiz claims this denied him the ability to present his arguments as to why Dr. Weinstein's testimony was in fact reliable.

Ortiz's argument lacks merit. In <u>Miller</u>, we held a <u>Daubert</u> hearing is not always necessary and noted "the basic requirement under the law is that the parties have an 'opportunity to be heard before the district court makes its decision.'" <u>Miller</u>, 439 F.3d at 412 (quoting <u>Group Health Plan Inc. v. Philip Morris USA, Inc.</u>, 344 F.3d 753, 761 n.3 (8th Cir. 2003)). Ortiz was afforded this opportunity.

This is not a case where the district court, acting as a "gatekeeper," kept evidence from the fact-finding jury. <u>See</u> <u>In re Zurn Pex Plumbing Prods. Liab. Litig.</u>, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of <u>Daubert</u> exclusion is to protect juries from being swayed by dubious scientific testimony."). Here, the district court *was* the fact finder and in that role heard the complete testimonies from Dr. Weinstein, supplemented by Dr. Olley's declaration, and Dr. Vasquez as to their differing methodologies and opinions relating to Ortiz's mental status. Ortiz knew from Dr. Vasquez's report that Dr. Weinstein's methodology was under attack by the government and Ortiz had adequate opportunity to be heard on the issue at the § 2255 hearing. We also note the district court made an alternative finding that Dr. Weinstein's testimony was not as reliable as Dr. Vasquez's testimony. This alternative finding was an independent ground for the district court's ultimate determination Ortiz failed to prove he is mentally retarded.

As to the substance of the <u>Daubert</u> ruling, Ortiz claims the district court "got it completely wrong" because "Dr. Weinstein's opinions are mainstream, accepted science, and Dr. Vasquez's are not." Science itself, and certainly judicial scientific fact finding, is not determined by majority vote. We reserve judgment on this issue in light of our remand to the district court. We also decline to analyze Ortiz's claim that the rationale employed by the district court violated Ortiz's constitutional rights.

### 3. Whether Ortiz is Mentally Retarded

We must still address Ortiz's request that we vacate his death sentences. In support of his request, Ortiz argues the evidence conclusively demonstrates he meets all three prongs necessary for a mental retardation diagnosis.

Ortiz first claims he meets the intellectual function prong, because "all the scores, on four tests given by different examiners at different times, are in the mentally retarded range, there is 'convergent validity' establishing that Ortiz's I.Q. is in the mentally retarded range." Ortiz contends Dr. Vasquez's efforts to minimize the significance of Ortiz's I.Q. scores fail because they are based on faulty science and analysis.

Regarding the adaptive function prong, Ortiz maintains the objective data collected by Dr. Weinstein and Dr. Vasquez both reveal significant deficits meeting the diagnostic criteria. Ortiz explains the scores he obtained on the ABAS-II confirm his mental retardation. According to Ortiz, only by violating professional standards in dismissing Ortiz's recorded deficits as "cultural" and focusing on Ortiz's reported strengths instead of his weaknesses, did Dr. Vasquez arrive at her opinion that Ortiz is not mentally retarded. Ortiz also argues the record demonstrates his deficits originated before he was 18 through Fernandez's social history report showing his family observed these deficits in Ortiz during his early developmental period.

In light of this evidence, Ortiz claims he has conclusively demonstrated he is mentally retarded. We disagree for several reasons.

First, the evidence is not as conclusive as Ortiz suggests. Ortiz is correct in his assertion that his test scores, viewed in isolation, could support a finding of mental retardation. But such test scores are imprecise and standing alone cannot support a diagnosis. Instead, qualified experts must interpret those results for the subject individual. See Wiley v. Epps, 625 F.3d 199, 215, 217 (5th Cir. 2010) (explaining "[t]he calculation of a person's IQ score is imprecise at best and may come down to a matter of the examiner's judgment" and recognizing "there is not one test to determine mental retardation, . . . [and] there has been no agreement among professionals as to the proper test for assessing adaptive behavior") (internal citations omitted). For Ortiz, two experts performed comprehensive evaluations, interpreted the data, and arrived at different conclusions. The district court found Dr. Vasquez more reliable and credible than Dr. Weinstein. Only rarely will we disturb such a credibility determination. See United States v. Vaughn, 410 F.3d 1002, 1004 (8th Cir. 2005) (emphasizing a district court's "credibility findings are 'virtually unreviewable on appeal'") (quoting United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992)) .

And Ortiz's argument—that established science discredits Dr. Vasquez's approach and dictates a mental retardation diagnosis—depends heavily upon the extra-record declarations of other purported experts in the field of mental retardation. We do not consider this untimely evidence.

Ortiz's argument is also flawed because it incorrectly assumes the Atkins decision delegates to the scientific community the finding of whether an individual is mentally retarded. As one court recently noted, "psychology informs, but does not determinatively decide, whether an inmate is exempt from execution," leaving the "contours of the constitutional protection to the courts." United States v. Bourgeois,

Nos. C-02-CR-216 and C-07-223, 2011 WL 1930684, at *24 (S.D. Tex. May 19, 2011).

We illustrate this point by briefly discussing Ortiz's argument that Dr. Vasquez and the district court erred in considering Ortiz's strengths in their adaptive function analysis. Ortiz proposes "[i]t is bedrock science that if the subject has adaptive *deficits* that satisfy the diagnostic criteria . . . , then the diagnosis should be made even if the subject also has strengths." We reject this proposition, observing that while "[t]he mental health community [may] ignore[] an individual's strengths when looking at adaptive functioning[,] . . . presumably as a function of its role in providing support and services to impaired individuals[,] . . . [t]he law makes a holistic view of an individual, recognizing that a few reported problems may not negate an inmate's ability" to function in other ways. Bourgeois, 2011 WL 1930684 at *31-32 (citing Williams v. Quarterman, 293 F. App'x 298, 313-14 (5th Cir. 2008) (unpublished per curiam); Clark v. Quarterman, 457 F.3d 441, 447 (5th Cir. 2006); United States v. Webster, 421 F.3d 308, 313 (5th Cir. 2005)). Consideration of an individual's strengths may often prove necessary to provide context and definition for consideration of reported deficits.

In making this observation, we offer no comment as to whether Ortiz's strengths disqualify him from a mental retardation diagnosis or outweigh Ortiz's mental deficits. Such weighing of the evidence is uniquely for the district court's judgment. We express no opinion whether the evidence shows Ortiz is mentally retarded or not. For now it is enough to say that after reviewing the record before us, we have not reached "a definite and firm conviction" the district court made a clear mistake in its determination of Ortiz's mental status. Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (quotation marks omitted)). Accordingly, we do not affirm or vacate the sentence.

## D.    Ineffective Assistance Claim

We next address Ortiz's ineffective assistance claim.  Ortiz claims "[c]ounsel failed to provide Ortiz with effective assistance at capital sentencing" by not presenting mitigating evidence to the jury that "Ortiz was raised in an abusive, impoverished, and dysfunctional setting" and "is a brain damaged, impaired person." Ortiz charges this legal assistance failure was caused by counsel's inadequate investigation into Ortiz's childhood in Colombia and failure to obtain a mental health examination of Ortiz.  In a related claim, Ortiz argues the district court abused its discretion in denying funds for certain family members to travel from Colombia to Kansas City, Missouri, for the post-conviction evidentiary hearing.  After careful review of the record, we affirm the district court's denial of Ortiz's ineffective assistance claim.

### 1.    Reasonableness of the Investigation

In order to establish constitutionally defective representation, Ortiz must first demonstrate "counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Ortiz] by the Sixth Amendment."  See Strickland, 466 U.S. at 687.  Ortiz must also demonstrate "the deficient performance prejudiced the defense."  Id.  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffective assistance claim."  Id. at 700.

In evaluating Ortiz's charge that counsel failed in its duty to "conduct a thorough investigation of [Ortiz's] background," Williams v. Taylor, 529 U.S. 362, 396 (2000), our focus is on whether the investigation was reasonable, see Wiggins v. Smith, 539 U.S. 510, 523 (2003).  This is an objective review, measured against the prevailing professional norms at the time of the investigation.  See id.  It is "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time" without "the distorting effects of hindsight."  Id. (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted).

We conclude the investigation was reasonable, especially considering the challenges counsel faced in obtaining information to investigate Ortiz's history, including Ortiz's refusal to participate in a mental examination and refusal to cooperate in providing family information. We hold counsel's efforts met the professional norms at the time of the investigation, see Bobby v. Van Hook, __ U.S. __, ___, 130 S. Ct. 13, 16-17 (2009) (clarifying "[r]estatements of professional standards [such as the ABA Guidelines] . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place"); Worthington v. Roper, 631 F.3d 487, 498 (8th Cir. 2011) (similar), and were within "the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

While Ortiz classifies counsel's attempts to contact his Colombian family as "far from . . . thorough," we cannot say counsel's efforts were constitutionally deficient according to the professional norms at the time. The ABA standards in effect during Ortiz's trial, which we find are a useful guide in this case, provide "[c]ounsel should conduct independent investigations relating to the . . . penalty phase of a capital trial . . . regardless of any initial assertion by the client that mitigation is not to be offered . . . [and] this investigation should comprise efforts to discover all *reasonably available* mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A) and (C) (1989) (emphasis added). The standards also state "[c]ounsel should *consider* interviewing potential witnesses . . . familiar with aspects of the client's life history that might affect . . . mitigating evidence to show why the client should not be sentenced to death[,]" as well as "members of the victim's family opposed to having the client killed." Id. at 11.4.1(D)3.B and C (emphasis added). And the commentary to Rule 11.4.1 notes, "[c]ounsel's duty to investigate is not negated by the expressed desires of a client[,] [n]or may counsel 'sit idly by, thinking that investigation would be futile.'"

This is not a case where counsel "sat idly by." Counsel actively investigated Ortiz's history, trying to locate his family in another country despite Ortiz's command to the contrary. Counsel testified Ortiz was not forthcoming about his family and background and expressly directed counsel not to contact members of his Colombian family. But counsel continued to investigate, traveling to (1) Houston, Texas, on more than one occasion to interview Cooper, Reed, Riley, and others; (2) a prison in Huntsville, Texas, to interview Ortiz's uncle; (3) Las Vegas, Nevada, to meet with Ortiz's alleged drug associate, Montano; (4) Chicago, Illinois, to meet with the Colombian consulate and a possible Colombian mitigation specialist; and (5) Atlanta, Georgia, to meet with another Colombian mitigation specialist.

This is not a situation, like Wiggins, where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" despite becoming aware of troubling circumstances in the petitioner's history. Wiggins, 529 U.S. at 524-25. Ortiz's counsel expended significant time and resources in conducting their penalty phase investigation. Using contact information collected from Ortiz's uncle during the investigation, counsel unsuccessfully attempted to contact Ortiz's Colombian family by telephone and letter. Counsel also obtained funding for a mitigation specialist to travel to Colombia. With no verified contact information or cooperation from Ortiz or his family in Colombia, counsel decided such a trip would be futile and never retained the mitigation specialist. Defense counsel testified to an estimated "couple hundred people" contacted by the defense team. Considering the circumstances, we conclude counsel made a sufficient attempt to discover all reasonably available mitigating evidence. See Cullen v. Pinholster, ___ U.S. ___, ___, 31 S. Ct. 1388, 1403 (2011) (emphasizing, to overcome the strong presumption that counsel's assistance was adequate "a defendant must show that counsel failed to act reasonably considering all the circumstances") (quoting Strickland, 466 U.S. at 688) (internal marks omitted)). Ortiz's counsel obviously were functioning as Ortiz's lawyers, and such functioning was not deficient. See Strickland, 466 U.S. at 687.

Nor do we believe the investigation was constitutionally deficient because counsel did not obtain a mental health examination of Ortiz. While theorizing "it is probably true that defense counsel in a capital case should routinely have their client evaluated by a mental health professional[,]" we have declined to "lay down any per se rule." Jones v. Delo, 258 F.3d 893, 902 (8th Cir. 2001); see Nooner v. Norris, 402 F.3d 801, 809 (8th Cir. 2005) (concluding "trial counsel's judgment not to pursue psychiatric testing for purpose of mitigation" was reasonable, in part, because there was no indication petitioner had "any mental or psychological problems").

Pace ("no question he didn't have any [mental] issues"), Lozano ("no indication that he had any mental impairment that I could see"), and Ninemire ("If I would have observed something" on his mental status) all testified that nothing led them to believe Ortiz had mental health problems. Despite this fact, Pace tried to convince Ortiz to participate in a mental health examination during their two meetings together. Both times, Ortiz refused and changed the subject. Once Pace believed Ortiz was "shut[ting] down" because of Pace's efforts, he backed off, reasoning Ortiz "didn't have any issues anyway and we desperately needed to work with him." Ninemire also testified Pace kept probing about mental health, but Ortiz "was very adamant . . . he was not going to participate." And Lozano testified he "observed nothing suggesting . . . mental retardation," and Ortiz rebuffed any suggestion to consider a mental health defense. We view counsel's decision not to obtain a mental health examination of Ortiz as a tactical choice, necessary to keep Ortiz cooperating with the defense team. See Wiggins, 539 U.S. at 521 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). As the district court found, a mental examination was not obviously necessary, and counsel's decision not to pursue that line of investigation was a reasonable professional judgment under the circumstances.

Considering counsel made significant attempts to investigate Ortiz's history and tried to convince Ortiz to participate in a mental health examination despite not believing one was necessary, we hold counsel's performance during the penalty phase, including not putting forth mitigating witnesses, was reasonable. Having witnessed the failure of Sinisterra's "parade of family members" giving "heart-wrenching" testimony to prevent a death penalty verdict, Ortiz's counsel's focus on an argument that Ortiz was not the shooter was a reasonable tactic. Defense counsel's performance was not constitutionally deficient. See Wiggins, 539 U.S. at 521-22 (quoting Strickland, 466 U.S. at 690-91) (declaring strategic decisions after a thorough investigation of relevant law and facts "are virtually unchallengeable" on appeal). Because Ortiz failed to show deficient performance by counsel, it is unnecessary to address the prejudice question. See Strickland, 466 U.S. at 700.

### 2.    Specific Challenges

Having reached the conclusion counsel's investigation was not constitutionally deficient, we briefly address Ortiz's specific challenges to the district court's denial of his § 2255 motion. First, we address Ortiz's contention the district court erred as a matter of law in its belief that Ortiz's lack of cooperation excused counsel from their duty to perform a thorough investigation. Ortiz cites cases for the proposition that counsel has a duty to investigate even when the client is uncooperative. See, e.g., Rompilla v. Beard, 545 U.S. 374, 381, 383 (2005) (holding counsel's failure to investigate adequately was ineffective performance despite defendant's lack of interest, minimal contributions to the mitigation case, and partial active obstruction). We agree with the proposition of law, but reject Ortiz's characterization of the district court's reasoning. The district court did not hold Ortiz's lack of cooperation excused counsel's duty to investigate, but rather found it impeded the success of counsel's investigation. This is consistent with the Supreme Court's admonition that courts consider all circumstances when evaluating the reasonableness of an investigation. See Wiggins, 539 U.S. at 523 (explaining a review of counsel's performance is "a context-dependent consideration").

Next, we address Ortiz's assertion the district court clearly erred in finding trial counsel did not have cooperation from Ortiz in contacting his family nor possessed "valid family contact information." Ortiz highlights the January memorandum sent from Lozano to Pace, which relayed information from Ortiz about members of his Colombian family. Ortiz claims this demonstrates he was cooperative. Ortiz also argues that since Fernandez, Ortiz's post-conviction mitigation specialist, was able to contact his Colombian family members with the same phone numbers and addresses trial counsel possessed, the information was valid. We do not believe either finding represents reversible error. Counsel testified Ortiz gave false information about his family, shut down when discussing his background, and expressly told them not to contact his family. One instance of providing some information does not conclusively demonstrate Ortiz was generally cooperative. And even if the contact information proved valid when Fernandez contacted the family years later, the significance of the district court's finding that the contact information was "invalid" was that counsel was not able to establish contact, after multiple attempts, with the family using this information.

### 3. Denial of Funding for Lay Witness Travel

Finally, we consider Ortiz's allegation he was denied the opportunity for a fair representation because the district court denied funds for his father, brother, and former roommate to travel from Colombia to Kansas City to testify at Ortiz's post-conviction evidentiary hearing.

Title 18, United States Code, Section 3599(f), governing the appointment of "[c]ounsel for financially unable defendants" subject to death sentences, provides

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant

and, if so authorized, shall order the payment of fees and expenses therefore under subsection (g).

According to Ortiz, the lay witnesses would have offered testimony beneficial in demonstrating Ortiz's "deprived and socially isolated childhood, and [his] significant developmental delays," supporting a finding of mental retardation, and also directly refuting counsel's testimony about trying to contact the family. Ortiz argues that because his request for funds "was reasonable and necessary for the fair presentation of Ortiz's claims," it was an abuse of discretion to deny it. We disagree.

Ortiz's motion indicates the district court was willing to entertain such evidence in the form of affidavits or testimony via live video feed. Ortiz did not avail himself of these alternative options. Consequently, there was nothing in the record beyond Ortiz's bare assertions as to what evidence the lay witnesses would have given from which Ortiz can show prejudice. "Denial or limitation of funds is not grounds for reversal absent a showing of prejudice." United States v. Bledsoe, 674 F.2d 647, 668 (8th Cir. 1982).

## III.  CONCLUSION

We vacate the district court's denial of Ortiz's Atkins claim and remand for reconsideration consistent with this opinion. We affirm the district court's denial of Ortiz's ineffective assistance of counsel claim.

_____